**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

**WESLEY MOMAN, III,**

**Plaintiff,**

v.

**Case No. 20-CV-331-JFH-JFJ**

**OGU OFFICER BRENT BARNHART;
DETECTIVE GREG MITCHELL; and
DETECTIVE R.M. TUELL,**

**Defendants.**

**OPINION AND ORDER**

Plaintiff Wesley Moman, III, brings this civil rights action, under 42 U.S.C. § 1983, against

Defendants Officer Brent Barnhart, Detective Greg Mitchell and Detective R.M. Tuell

(collectively, "Defendants"), all of whom are employed by the Tulsa Police Department ("TPD").

Moman alleges Defendants violated his Fourth Amendment rights during the execution of a search

warrant at his home in July 2018.  Before the Court is Defendants' Motion for Summary Judgment

and Brief in Support ("Motion").  Dkt. No. 28.  Moman did not file a timely response to the

Motion.[1]  Having considered Moman's Pro Se Prisoner Civil Rights Complaint ("Complaint")

---

[1] Defendants filed the Motion on February 24, 2021.  As Moman was previously advised, he had
21 days, or until March 17, 2021, to file a response.  Dkt. No. 24 at 2-3.  Nearly nine months after
the response deadline expired, Moman submitted a letter requesting leave to submit copies of
transcripts that he believes may lend support to one of his Fourth Amendment claims.  Dkt. No.
31.  To the extent the Letter could be construed as a motion requesting leave to file an out-of-time-
response, the Court DENIES that request.  Moman alleges he was not able to make copies of the
transcripts because his correctional facility "has been on lockdown all this year and [he has] no
access to the law library at all."  Dkt. No. 31 at 1.  But, even assuming those allegations are true,
Moman offers no explanation for the nine-month delay in requesting additional time to respond to
the Motion.

[Dkt. No. 1],[2] the Motion and supporting exhibits, and applicable law, and for the reasons stated herein, the Court GRANTS the Motion.

## STANDARD

A party in a civil action may move for summary judgment as to any claim or defense, and a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). At the summary-judgment stage, the court's task "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material when it "might affect the outcome of the suit under the governing [substantive] law." *Anderson*, 477 U.S. at 248. In determining whether to grant a motion for summary judgment, the court "view[s] the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017) (quoting *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011)). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

---

[2] For purposes of summary judgment, the Court treats Moman's verified Complaint, as an affidavit to the extent the statements therein meet the requirements set forth in Fed. R. Civ. P. 56(c)(4). *Lantec, Inc., v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002); *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988))); *see* Fed. R. Civ. P. 56(c)(4) (providing that an affidavit must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated therein"). In addition, because Moman appears without counsel, the Court liberally construes the Complaint. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

*Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).  Consistent with the plain language of Rule 56(a), the movant bears the burden to show that there are no genuine issues for the jury to resolve and that the movant is entitled to judgment as a matter of law.  *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J. concurring).

## UNDISPUTED MATERIAL FACTS

Unless otherwise noted, the following facts are undisputed.  At approximately 5:00 a.m., on July 16, 2018, surveillance video captured images of two individuals burglarizing Westview Medical Center at 3606 N. Martin Luther King Boulevard, in Tulsa, Oklahoma (hereafter, "the Westview burglary").  Dkt. No. 28-8 at 2.[3]  The suspects used various tools, including an orange concrete saw with a yellow sticker and a yellow crow bar, and both suspects wore "distinct boots." Dkt. No. 28-8 at 2.  The suspects stole several bottles of prescription medications.  Dkt. No. 28-8 at 2.  One suspect wore a mask that partially covered his face, had a scar on his exposed forehead, had "hooded" eyes, and, based on the contours of the mask near his jawline, appeared to have a beard.  Dkt. No. 28-8 at 2.  A maroon SUV, possibly a Chevy Tahoe, was seen on the surveillance video.  Dkt. No. 28-8 at 2.  Around 5:30 p.m. on July 16, 2018, Detective Greg Mitchell ("Mitchell") saw a maroon 2004 Chevy Tahoe parked in front of Moman's house.  Dkt. No. 28-8 at 2.  Mitchell was aware that Moman had several prior felony convictions, and a comparison of Moman's photograph with the images from the surveillance video of the Westview burglary revealed that Moman resembled one of the suspects; specifically, Moman had a similar scar on his forehead, "hooded" eyes, and a beard.  Dkt. No. 28-8 at 2.

---

[3] For consistency, the Court's citations refer to the CM/ECF header pagination.

On the morning of July 19, 2018, Officer Stephen Blaylock ("Blaylock"),[4] an officer with the TPD's Organized Gang Unit ("OGU"), submitted an affidavit in support of his request for a warrant to search Moman's home.  Dkt. No. 28-2 at 1-2.  Blaylock stated in the affidavit "that within the past week he had been contacted by a reliable confidential informant" who reported to Blaylock that he had seen "a black two barrel shotgun" in Moman's possession at Moman's home.  Dkt. No. 28 at 9; Dkt. No. 28-2 at 1-2.  Blaylock further stated that Moman was known to the TPD as a certified gang member and that Moman had prior felony convictions for possession of a stolen vehicle, attempted second-degree burglary, and three drug offenses.  Dkt. No. 28-2 at 2.  A special district judge issued a search warrant for Moman's residence in Tulsa, Oklahoma, at 10:00 a.m. on July 19, 2018.  Dkt. No. 28-1 at 1.   The warrant authorized officers to search the premises[5] for firearms, including the black two-barrel shotgun Moman reportedly possessed, firearm ammunition, proof of ownership of the firearms and ammunition, and any evidence indicating proof of residency.  Dkt. No. 1 at 8; Dkt. No. 28-1 at 1.  Sometime before serving the search warrant, the group of OGU officers tasked with serving the warrant held a meeting[6] and Officer

---

[4]  Blaylock is not a defendant in this action.

[5]  The warrant specifically permitted a search of the "house, building and premises, the curtilage thereof and the appurtenances thereunto, and any vehicles directly on the property or in the street in front of or nearby or adjacent to [Moman's residence], provided that prior to searching said vehicle or vehicles, the vehicles can be specifically connected to [Moman], belonging for the described property, and if found to seize the same and safely keep it."  Dkt. No. 28-1 at 1.

[6]  The details of the meeting are not in the record, but the Court finds it reasonable to infer that Blaylock shared information about Moman's criminal history, his gang membership, and his alleged possession of a firearm with the group of officers who were assigned to serve the warrant.

Brent Barnhart ("Barnhart") was designated "as the non-lethal pepperball gun operator."[7]  Dkt. No. 28-4 at 1.

Around 11:00 a.m. on July 19, 2018, several OGU officers, including Blaylock and Barnhart, approached Moman's house to serve the search warrant. Dkt. No. 1 at 8; Dkt. No. 28 at 9-10.  The officers were dressed in protective head gear and bulletproof vests and at least one officer carried a large protective metal shield.  Dkt. No. 28-5 at 00:50-01:50.[8]  The officers encountered an unidentified man in Moman's garage, and one officer detained him.  Dkt. No. 28-5 at 01:05-01:15.  Five to six officers, including Barnhart, proceeded to Moman's front door, and Barnhart positioned himself behind three officers who were standing on the front step.  Dkt. No. 28-5 at 01:15-01:32.  The interior front door was open but an exterior storm door was closed and locked.  Dkt. No. 28-3 at 7.  Corporal Rusty Brown ("Brown")[9] knocked on the door and announced, "Tulsa Police, search warrant, come out with your hands up," just seconds before Blaylock used a "jersey claw" to pry open the storm door.  Dkt. No. 28-4 at 1; Dkt. No. 28-5 at 01:25-01:33.[10]  Immediately after prying open the storm door, Blaylock moved down from the

---

[7]  According to Barnhart, a pepperball gun deploys "P.A.V.A. rounds" which "are considered a non-lethal use of force option."  Dkt. No. 28-4 at 1.  *See also Clark v. Colbert*, 895 F.3d 1258, 1262 (10th Cir. 2018) (describing a "pepperball launcher" as a "device [that] uses compressed gas to propel small, round projectiles that burst open on impact, releasing a pepper-spray-like irritant from a distance").

[8]  Defendants' Exhibit 5 [Dkt. No. 28-5] is a DVD depicting audio/video footage from Barnhart's body-worn camera.  The video is less than 10 minutes long and the Court has viewed it in its entirety.  All times cited herein are approximate and are based on the clock at the bottom of the viewing screen.

[9]  Brown is not a defendant in this action.

[10]  Other than Barnhart, the identity of the officers seen in the video footage is unclear.  However, statements in other exhibits support that the officer seen using a tool to pry open the storm door is Blaylock and that the officer seen in the video standing by the door shouting commands is Brown.  Dkt. No. 28-3; Dkt. No. 28-4.

front step and stood to the right of the step, and Barnhart approached the open front door, positioning himself beside Brown.  Dkt. No. 28-5 at 01:33-01:37.  Seconds later, as Brown announced, "Tulsa Police, come out with your hands up," Barnhart began shooting pepperballs at Moman through the open front door.  Dkt. No. 28-5 at 01:34-01:43; Dkt. No. 28-4 at 1.

The parties disagree on the impetus for Barnhart's decision to deploy pepperballs.  In his post-incident report, dated July 23, 2018, Barnhart states that he saw Moman exit a hallway and enter the living room.  Dkt. No. 28-4 at 1.  Barnhart then heard Brown say, "Tulsa Police, search warrant come out with your hands up!"  Dkt. No. 28-4 at 1.  Then, according to Barnhart, "Moman turned his body back toward the hall he exited from and took a step in that direction."  Dkt. No. 28-4 at 1.  After he saw Moman take a step toward the hall, Barnhart "began delivering pepperballs towards Moman's upper back" because "Moman was attempting to retreat into another area of the house" and because Moman failed to comply with the officers' verbal commands.  Dkt. No. 28-4 at 1.  Defendants also note that Blaylock's supplemental report states that after "[c]ommands were given," Moman "began to look around and acted as if he was going to pick something up."  Dkt. No. 28 at 10; Dkt. No. 28-3 at 7.  Moman disputes these descriptions of his response to the officers' verbal commands, stating that "[j]ust after officers entered into his home and [began] screaming commands, [he] exited his bedroom with his hands in the air and then stopped," and that he "fully complied with the officers' demands."  Dkt. No. 1 at 8-9.  The video footage from Barnhart's body-worn camera does not provide any discernible view of Moman or his purported movements

prior to Barnhart's use of the pepperball gun. Dkt. No. 28-5 at 01:29-01:43.[11]

The parties agree that Barnhart fired a total of 10 pepperballs at Moman, striking him five times.[12] Dkt. No. 1 at 8; Dkt. No. 28-4 at 1. After shooting Moman with pepperballs, Barnhart resumed his position behind the front step while Brown and a second officer near the front door continued shouting commands at Moman. Dkt. No. 28-5 at 01:42-01:48. Moman walked out of the house dressed only in shorts, and other officers placed him in handcuffs and walked him toward the front yard and asked if anyone else was in the house. Dkt. No. 28-5 at 1:53-2:30. Moman stated that his girlfriend and six-year-old grandson were inside the home. Dkt. No. 28-5 at 02:35-02:46. Officers near the front door continued shouting commands and warned the other occupants that they would "probably get pepperballed" if they failed to comply. Dkt. No. 28-5 at 02:34-02:46. Moman's girlfriend and grandson exited the home without incident. Dkt. No. 28-3 at 7; Dkt. No. 28-5 at 02:50-03:20.

At some point, paramedics arrived, rinsed pepperball residue from Moman's body and treated his injuries. Dkt. No. 1 at 8; Dkt. No. 28-3 at 7; Dkt. No. 28-4 at 1. Moman states that he "suffered scrapes, bruises, swelling, etc., to his under arms, sides of his chest, back and legs," and he has scars under his arms from the impact of the pepperballs. Dkt. No. 1 at 8.

During the search of Moman's home, OGU officers found some items that were described in the search warrant, including a loaded semiautomatic handgun and proof that Moman lived in

---

[11]   The video footage provides no clear view of Moman leading up to Barnhart's use of the pepperball gun. As previously stated, Blaylock stepped away from the front door immediately after he pried it open. Thus, it is not apparent from the video footage that Blaylock would have been in a position to see Moman's movements, or that Blaylock shared, or would have had time to share any information with Barnhart about Moman's alleged attempt to "reach[] for something" before Barnhart deployed the pepperballs.

[12]   According to Barnhart, 10 rounds of pepperballs is the equivalent of one application. Dkt. No. 28-4 at 1.

the home.  Dkt. No. 28-3 at 4, 8.[13]  OGU officers also found several items that were not described

in the search warrant, including controlled substances, baggies containing large and small

quantities of prescription medications, a digital scale, and $5300 in cash.  Dkt. No. 28-3 at 4-5.  In

the main living room, Blaylock found "a STIHL concretes saw, a yellow crow bar, and a pair of

boots along with several other tools."  Dkt. No. 28-3 at 8.  Blaylock notified Mitchell that he found

these particular items, and Mitchell collected these items as evidence related to his investigation

of the Westview burglary. Dkt. No. 28-3 at 8; Dkt. No. 28-8 at 2; Dkt. No. 28-9 at 2.[14]

Mitchell also found a 2015 Harley Davidson motorcycle in Moman's garage.  Dkt. No. 28-

9 at 2.  Mitchell saw that the motorcycle had no tag, ran a check on the vehicle identification

number, and confirmed that the motorcycle had been reported stolen in Texas.  Dkt. No. 1 at 11;

---

[13]  The loaded handgun was found in the back living room of Moman's house.  Dkt. No. 28-3 at 4.
Nothing in the record shows that the officers found the black two-barrel shotgun described in the
search warrant.

[14]  The extent of Mitchell's and Tuell's involvement in the search is not clear from the record.
Moman states that both detectives "accompan[ied] the (OGU) on their search for guns." Dkt. No.
1 at 11-12.  Defendants state, in a narrative portion of the Motion without citation to evidentiary
materials, that Mitchell did not assist in the OGU officers' search until he "was invited inside"
after Blaylock found the burglary tools, and that Tuell was in her office at the TPD headquarters
and did not arrive at Moman's house until after Mitchell notified her that the burglary tools had
been found.  Dkt. No. 28 at 8. Defendants also submitted a narrative Mitchell included with a
police report wherein Mitchell states he "assisted in the search," but the focus of the report is his
discovery of a stolen motorcycle, as further discussed below.  Dkt. No. 28-9 at 2.  No portion of
the record explains how Blaylock would have understood the significance of his discovery of a
concrete saw, a crow bar, other tools or a pair of boots in Moman's living room or why Blaylock
would have known to relay that information to Mitchell absent some prior discussion between
Blaylock and Mitchell about the burglary investigation or Mitchell's actual participation in the
search.  As previously noted, *see supra* n.1, Moman submitted an untimely request to submit copies
of transcripts that he posits would shed light on how and why Mitchell became involved in the
search.  Dkt. No. 31 at 1-2.  However, for purposes of resolving the summary judgment motion,
the Court finds it reasonable to infer from the evidence presented, viewed in Moman's favor, that
Mitchell assisted in the search, and that Tuell assisted in a portion of the search sometime after
Blaylock discovered the burglary tools.

Dkt. No. 28-9 at 2.   Allied Towing of Tulsa ("Allied")[15] towed the stolen motorcycle from Moman's property.  Dkt. No. 28-9 at 2.  At the request of Officer Chance Davis ("Davis"), Allied also towed a second motorcycle found on the property, described as a 2013 Harley Davidson licensed in Oklahoma and owned by Moman.  Dkt. No. 28-10 at 1; Dkt. No. 28-13 at 2, 7.  Davis noted on the Tow-In Report that Moman's motorcycle was subject to a TPD hold and indicated that the reason for the hold was "burglary."  Dkt. No. 28-10 at 1.[16]

The State did not include Moman's motorcycle in a civil forfeiture proceeding and, on March 1, 2019, the TPD notified Allied, by fax, and Moman, by mail, that the TPD had released its hold on Moman's motorcycle.  Dkt. No. 1 at 11; Dkt. No. 28-11 at 1; Dkt. No. 28-12 at 1.  On March 6, 2019, Allied sent a Notice of Possessory Lien to Moman's residential address via certified mail.  Dkt. No. 28-13 at 5-6, 9.  The Notice of Possessory Lien was returned to Allied on April 1, 2019, with a label attached to the envelope stating "Return to Sender [illegible] Unable to Forward."  Dkt. No. 28-13 at 5, 8.  On April 2, 2019, Allied sent a Notice of Sale to Moman's residential address, via certified mail.  Dkt. No. 28-13 at 2, 4, 10-11.  The Notice of Sale indicated that Moman's motorcycle would be sold at auction on April 16, 2019.  Dkt. No. 28-13 at 10.  The Notice of Sale was returned to Allied on April 15, 2019, with a label attached to the envelope indicating "Return to Sender [illegible] Unable to Forward."  Dkt. No. 28-13 at 3, 11.  On or about April 20, 2019, Moman learned "that his motorcycle had been auctioned off by the State."  Dkt.

---

[15]  Allied is not a defendant in this action.

[16]  Moman states that Mitchell and Tuell were "running checks" on both motorcycles found on his property and asserts that the detectives seized his motorcycle.  Dkt. No. 1 at 11-12.  It is not clear that Moman would have personal knowledge of who investigated the ownership of either motorcycle or which officers or detectives seized them.  However, because Davis indicated on the Tow-In Report that the reason for placing a TPD hold on Moman's motorcycle was "burglary," the Court infers, solely for purposes of summary judgment, that one or both detectives directed Davis to seize Moman's motorcycle.

No. 1 at 12.  Before that, Moman did not receive "any type of notification" regarding the sale. Dkt. No. 1 at 12.

As a result of the items found during the July 2018 search of his home, the State of Oklahoma charged Moman, in the District Court of Tulsa County, Case No. CF-2018-3109, with 12 criminal offenses.  Dkt. No. 28-6 at 1-4.  On June 17, 2019, Moman pleaded guilty as charged. Dkt. No. 28-6 at 4; Dkt. No. 28-14 at 1-2.  Moman was convicted of drug offenses,[17] firearm offenses and, as relevant to this summary judgment proceeding, obstructing an officer, in violation of Okla. Stat. tit. 21, § 540, and second-degree burglary, in violation of Okla. Stat. tit. 21, § 1435. Dkt. No. 28-6 at 4; Dkt. No. 28-14 at 1-2.  In stating the factual basis for his guilty plea as to the latter two convictions, Moman admitted that "[o]n July 16, 2018, [he] did break into and steal from the Westview Medical Center in Tulsa County," and that on July 19, 2018, he "failed to obey lawful commands when [officers] served the warrant."  Dkt. No. 28-6 at 4.

## PROCEDURAL BACKGROUND

Moman commenced this action on July 9, 2020, under 42 U.S.C. § 1983,[18] and asserts two

---

[17]  It is undisputed that the State filed a civil forfeiture proceeding against Moman and, ultimately, decided not to include Moman's motorcycle in that proceeding.  Dkt. No. 1 at 12; Dkt. No. 28 at 11.  This suggests that the State did not consider the motorcycle to be personal property subject to forfeiture in relation to any of Moman's drug-offense convictions.  *See* Okla. Stat. tit. 63, § 2-503(B) (describing personal property subject to forfeiture proceedings to include "[a]ny property or thing of value of a person is subject to forfeiture if it is established by a preponderance of the evidence that such property or thing of value was acquired by such person during the period of the violation of the Uniform Controlled Dangerous Substances Act or within a reasonable time after such period and there was no likely source for such property or thing of value other than the violation of the Uniform Controlled Dangerous Substances Act").

[18]  To obtain relief under § 1983, a plaintiff must establish four general elements, namely, that (1) a "person" (2) acting under color of state law, (3) deprived [him] of, or caused another to deprive [him] of, (4) a right protected by the United States Constitution or other federal law.  *Dodds v. Richardson*, 614 F.3d 1185, 1200 (10th Cir. 2010); *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002).  As to the fourth element, the plaintiff also must establish the specific elements necessary to prove the alleged constitutional violation.

Fourth Amendment claims against Defendants.  In his first claim, Moman asserts that Barnhart violated his Fourth Amendment right to be free from an unreasonable seizure by using excessive force to detain him for purposes of executing the search warrant.  Dkt. No. 1 at 8-9.  Moman concedes that the officers executing the warrant "had a legitimate need to secure the premises for the purposes of completing their search."  Dkt. No. 1 at 9.  But he contends that Barnhart's use of the pepperball gun was "unjustifiable, disproportionate and 'objectively unreasonable,'" because Moman "was clearly complying with officers' demands (to stop and put his hands up) and [he] presented absolutely NO danger to anyone."  Dkt. No. 1 at 9.

In his second claim, Moman asserts that Mitchell and Tuell violated his Fourth Amendment rights to be free from an unreasonable search and seizure by searching for and seizing items that were not listed in the search warrant.  Dkt. No. 1 at 11-13.  To support this claim, Moman contends that Mitchell and Tuell "decided to 'piggy-back' and accompany the [OGU officers] on their search for guns" with the "intent" to go beyond the scope of the search warrant by looking for evidence related to the detectives' investigation of the Westview burglary.  Dkt. No. 1 at 11.  He contends that Mitchell and Tuell further exceeded the scope of the search warrant when they "started running 'checks' on motorcycles on the property, which were not 'guns' and [which were] totally unrelated to the OGU's warrant" and when they seized Moman's motorcycle which was

not listed on the search warrant.  Dkt. No. 1 at 11-13.[19]

Moman purports to sue each defendant in his or her individual and official capacities and seeks declaratory relief and nominal, compensatory and punitive damages.  Dkt. No. 1 at 4-5, 10, 13-14.

## ANALYSIS

Defendants move for summary judgment, asserting that (1) the Fourth Amendment claims are barred under *Heck v. Humphrey*, 512 U.S. 477 (1994), (2) they have qualified immunity as to the Fourth Amendment claims asserted against them in their individual capacities, (3) Moman fails to state any plausible official-capacity claims, and (4) the undisputed facts do not support Moman's claims for punitive damages.

## A.    *Heck v. Humphrey*

Defendants contend that they are entitled to judgment as a matter of law as to both Fourth Amendment claims because *Heck v. Humphrey*, 512 U.S. 477 (1994), bars both claims.  Dkt. No. 28 at 13-16.  In *Heck*, the United States Supreme Court explained that when the successful prosecution of a § 1983 action "would necessarily imply the invalidity of [the plaintiff's]

---

[19]  In the final paragraph of the facts he alleges to support his second claim, Moman alleges that on or about April 20, 2019, he found out that his motorcycle had been auctioned off by the State, without ANY type of notification or due process given." Dkt. No. 1 at 11-13. Defendants construe this allegation as Moman's attempt to state a separate Fourteenth Amendment due-process claim or state-law theft claim against Mitchell and Tuell based on the alleged lack of notice before the sale of his motorcycle.  Dkt. No. 28 at 21-22.  But even applying the rule of liberal construction, the Court does not read the Complaint to allege either a Fourteenth Amendment due-process claim or a theft claim.  Rather, Moman appears to suggest that the detectives "stole" his motorcycle by unlawfully seizing it and he appears to reference the sale of his motorcycle, without notice, to support his claim for compensatory damages from Mitchell and Tuell for the loss of his motorcycle.  Dkt. No. 1 at 14.  Moreover, while Moman makes arguments and cites authorities to support both Fourth Amendment claims, he does not do the same for any purported due-process or theft claims.  The Court therefore construes the Complaint as asserting only the two Fourth Amendment claims clearly identified by Moman.

conviction or sentence," the plaintiff cannot recover monetary damages unless the plaintiff first "prove[s] that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus."  512 U.S. at 486-87. However, "if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit."  *Id.* at 487 (emphasis in original) (footnotes omitted).

### 1.    Excessive-force claim

Defendants argue that Moman cannot proceed on his Fourth Amendment excessive-force claim against Barnhart because Moman pleaded guilty to obstructing an officer and, in doing so, he admitted that he failed to comply with the officers' lawful commands when they served the search warrant. Dkt. No. 28 at 15-16.

The *Heck* doctrine does not always bar an excessive-force claim asserted in a civil rights action by a plaintiff who has been convicted of obstruction, resisting arrest, or assaulting an officer during the course of an arrest or detention.  *See Havens v. Johnson*, 783 F.3d 776, 782 (10th Cir. 2015) ("An excessive-force claim against an officer is not necessarily inconsistent with a conviction for assaulting the officer.")  "For example, the claim may be that the officer used too much force to respond to the assault or that the officer used force after the need for force had disappeared."  *Id.*  Nonetheless, in some cases, "the excessive-force claim must be barred in its entirety because the theory of the claim is inconsistent with the prior conviction."  *Id.* at 783.  This latter situation is exemplified by a case where a plaintiff convicted of resisting arrest claims in a subsequent civil action for monetary damages that the arresting officers used excessive force

because "he did nothing wrong, but was viciously attacked for no reason." *Havens*, 783 F.3d at 783 (discussing and quoting *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 656 (5th Cir. 2007)). Thus, "[t]o determine the effect of *Heck* on an excessive-force claim, the court must compare the plaintiff's allegations to the offense he committed." *Havens*, 783 F.3d at 782.

As just discussed, Moman's Fourth Amendment claim against Barnhart alleges that Barnhart's use of the pepperball gun to detain him for purposes of executing the warrant was excessive and "disproportionate" because, in Moman's words, Moman "was clearly complying with officers' demands (to stop and put his hands up) and [he] presented absolutely NO danger to anyone." Dkt. No. 1 at 9. Moman also alleges that "[t]he scars that still remain under his arms prove that he had his hands up and [was] complying with officers' commands" when Barnhart shot him with pepperballs. Dkt. No. 1 at 8. Moman further alleges "there was absolutely and clearly 'NO' need for any amount of force to be taken against [him] . . . because [he] had stopped, put his hands up, and fully complied with the officers' demands." Dkt. No. 1 at 9.

In his criminal prosecution, Moman pleaded guilty to obstructing an officer in violation of an Oklahoma law that makes a misdemeanant of "[e]very person who willfully delays or obstructs any public officer in the discharge or attempt to discharge any duty of his or her office." Okla. Stat. tit. 21, § 540. And the factual basis for Moman's guilty plea shows that this conviction rests on his admission that he "failed to obey lawful commands when [officers] served the warrant." Dkt. No. 28-6 at 4.

In short, Moman's allegations demonstrate that the theory of the excessive-force claim he asserts in this action is that Barnhart's use of the pepperballs was excessive because Moman "did nothing wrong." As Defendants persuasively argue, Moman's theory of the claim is inconsistent with, and thus necessarily implies the invalidity of, his conviction for obstructing an officer. As a

result, the Court agrees that *Heck* bars the Fourth Amendment excessive-force claim against Barnhart.

### 2.      Search-and-seizure claim

Defendants argue that Moman cannot proceed on his Fourth Amendment search-and-seizure claim against Mitchell and Tuell because Moman pleaded guilty to second-degree burglary and, in doing so, admitted that he broke into and stole items from the Westview Medical Center. Dkt. No. 28 at 16.[20]  As a reminder, Moman claims that Mitchell and Tuell violated his right to be free from an unreasonable search and seizure because they (1) participated in the OGU officers' search for firearms when the detectives' "intent was to search for burglary evidence" not listed in the warrant, (2) investigated ownership of "motorcycles on the property" when motorcycles were not listed in the warrant, and (3) seized Moman's motorcycle which "was not on the warrant list." Dkt. No. 1 at 11-12.  Defendants' argument that *Heck* bars the Fourth Amendment claim against Mitchell and Tuell appears to focus only on the purportedly unlawful search for evidence of the Westview burglary and does not seem to address the portions of his claim alleging that that the detectives exceeded the scope of the search by investigating ownership of the motorcycles and unlawfully seized his motorcycle.  Dkt. No. 28 at 16.

Regardless, *Heck* itself recognized that allegations of an illegal search and seizure do not

---

[20]  Defendants also note that Moman moved to suppress evidence found during the search in his state criminal prosecution but then entered a guilty plea before the trial court ruled on the motion. Dkt. No. 28 at 16 n.1.  The significance of Defendants' footnote is not clear from the Motion.  But the fact that Moman pleaded guilty to second-degree burglary without waiting for the trial court to determine the lawfulness of the search does not preclude his claim in this civil action that Mitchell and Tuell's alleged actions rendered the search and seizure unlawful.  *See Haring v. Prosise*, 462 U.S. 306, 318, 323 (1983) (concluding that the plaintiff's "conviction in state court" which resulted from his guilty plea, "does not preclude him from now seeking to recover damages under 42 U.S.C. § 1983 for an alleged Fourth Amendment violation that was never considered in the state proceedings").

always implicate the validity of a plaintiff's conviction, stating,

> For example, a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction. Because of doctrines like independent source and inevitable discovery, *see Murray v. United States*, 487 U.S. 533, 539, 108 S. Ct. 2529, 2534, 101 L. Ed. 2d 472 (1988), and especially harmless error, *see Arizona v. Fulminante*, 499 U.S. 279, 307-308, 111 S. Ct. 1246, 1263-1264, 113 L. Ed. 2d 302 (1991), such a § 1983 action, even if successful, would not necessarily imply that the plaintiff's conviction was unlawful.  In order to recover compensatory damages, however, the § 1983 plaintiff must prove not only that the search was unlawful, but that it caused him actual, compensable injury, *see Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 308, 106 S. Ct. 2537, 2543, 91 L. Ed. 2d 249 (1986), which, we hold today, does not encompass the "injury" of being convicted and imprisoned (until his conviction has been overturned).

*Heck*, 512 U.S. at 487 n.7.

For two reasons, *Heck* poses no bar to Moman's Fourth Amendment claim against Mitchell and Tuell.  First, as further discussed below, Defendants invoke the plain-view doctrine to argue that Mitchell and Tuell did not violate the Fourth Amendment by searching for evidence of the Westview burglary because Blaylock inadvertently found that evidence in plain view during the execution of a lawful warrant.  Dkt. No. 28 at 19-21.  As just stated, *Heck* expressly contemplates that the application of certain judicial doctrines could support denying a motion to suppress evidence found during an unlawful search, for purposes of a defendant's criminal prosecution, without precluding that defendant from later asserting a civil claim for damages arising from the same unlawful search that gave rise to his or her valid conviction.  512 U.S. at 487 n.7.  Second, a fair reading of the Complaint shows that Moman alleges a compensable injury arising from the allegedly unlawful search and seizure that is distinct from any of his outstanding convictions—namely, the loss of his motorcycle that was seized and later sold at auction.  For these reasons, the Court concludes that *Heck* does not bar Moman's Fourth Amendment claim against Mitchell and Tuell.

B.     **Official-capacity claims**

Next, Defendants contend that they are entitled to summary judgment as to any official-capacity claims asserted in the Complaint because Moman's factual allegations are not sufficient to state any plausible official-capacity claims.  Dkt. No. 28 at 22-23.  The Court agrees.

A plaintiff who brings a civil rights action under § 1983 may sue a defendant in the defendant's individual capacity, official capacity, or both.  When a plaintiff sues a defendant in his or her individual capacity, the defendant "may be subject to personal liability and/or supervisory liability."  *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011).  To state a claim for personal liability, a plaintiff must allege facts demonstrating that the defendant personally participated in the alleged constitutional violation.  *Id.*  When a plaintiff asserts an official-capacity claim against a city official or employee, the plaintiff essentially seeks to hold the city liable for the alleged constitutional violation under a theory of municipal liability.  *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010).  But a municipality "may not be held liable under § 1983 solely because it employs a tortfeasor."  *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997).  Rather, a municipality "can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (alteration in original) (quoting *Polk Cty. v. Dodson*, 454 U.S. 312, 326 (1981)).  Thus, to state a plausible claim against a municipality, a plaintiff must allege facts demonstrating either "that the unconstitutional actions of an employee [1] were representative of an official policy or custom of the [municipality], or [2] were carried out by an official with final policy making authority with respect to the challenged action."  *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000).

To the extent Moman purports to sue each defendant in his or her official capacity, he effectively attempts to hold the City of Tulsa liable for the alleged Fourth Amendment violations

under a theory of municipal liability.  In the Complaint, Moman identifies specific actions each defendant performed, under color of state law and pursuant to his or her official duties as a member of the TPD.  But Moman identifies no facts suggesting that any individual defendant's alleged actions were representative of an official policy or custom promulgated or enforced by the City of Tulsa, and he identifies no facts suggesting that any individual defendant carried out those actions as officials with final policy making authority with respect to those actions.  *Seamons*, 206 F.3d at 1029.  Moman's allegations instead demonstrate that he intends to sue each defendant in his or her individual capacity for his or her "official acts,"—i.e., for acts each defendant performed under color of state law—but that he does not adequately plead facts necessary to sue them in their official capacities.  *See Melo v. Hafer*, 912 F.2d 628, 636 (3d Cir. 1990) ("It does not follow that every time a public official acts under color of state law, the suit must of necessity be one against the official in his or her official capacity.").  Thus, even liberally construed, the Complaint fails to state any plausible official-capacity claims.

## C.    Qualified immunity

Defendants contend they are entitled to summary judgment as to both Fourth Amendment claims on the basis of qualified immunity because (1) the undisputed facts show that they did not violate the Fourth Amendment and (2), even if Moman could establish a Fourth Amendment violation, there is no clearly established law that would have put Defendants on notice that their actions were unlawful.  Dkt. No. 28 at 16-21, 23-26.  Because the Court previously concluded that *Heck* bars the Fourth Amendment excessive-force claim, the Court necessarily confines its qualified-immunity analysis to the Fourth Amendment search-and-seizure claim.

### 1.    Legal standards

"[P]ublic officials enjoy qualified immunity in civil actions that are brought against them

in their individual capacities and that arise out of the performance of their duties." *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013). But individual officials are entitled to qualified immunity only "if their conduct does not violate clearly established statutory or constitutional rights." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). When a defendant moves for summary judgment on the basis of qualified immunity, the traditional summary-judgment standard governs the determination of whether summary judgment should be granted. Nevertheless, to overcome an assertion of qualified immunity, the plaintiff bears an initial burden to show (1) that the defendant's conduct violated the plaintiff's constitutional right and (2) that the right in question was clearly established in the law, such that any reasonable official in the defendant's position would have known his or her particular conduct was unlawful. *Thomson*, 584 F.3d at 1325-26 (Holmes, J., concurring). The court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first," *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), "and may resolve the question by finding either requirement is not met," *Mascorro v. Billings*, 656 F.3d 1198, 1204 (10th Cir. 2011).

In determining whether a plaintiff has shown a violation of a constitutional right, the court ordinarily must adopt the plaintiff's version of the facts. *Thomson*, 584 F.3d at 1325 (Holmes, J., concurring); *see also Whittier v. Kobayashi*, 581 F.3d 1304, 1307 (11th Cir. 2009) ("We resolve all issues of material fact in favor of the plaintiff, and then, under that version of the facts, determine the legal question of whether the defendant is entitled to qualified immunity."). But when a defendant asserts qualified immunity at the summary-judgment stage, the "plaintiff's version of the facts must find support in the record." *Thomson*, 584 F.3d at 1325 (Holmes, J., concurring). Thus, a court is not required to adopt a plaintiff's version of the facts if that version lacks evidentiary support, *id.*, or is "blatantly contradicted" by the record, *Scott v. Harris*, 550 U.S.

372, 380 (2007).

If the court finds that the plaintiff's version of the facts is sufficient to establish a constitutional violation, the court must also determine whether the right violated was clearly established. "The 'dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "It is clearly established that specific conduct violates a constitutional right when Tenth Circuit or Supreme Court precedent would make it clear to every reasonable officer that such conduct is prohibited." *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016). There need not be "a case directly on point for a right to be clearly established." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (citations and internal quotation marks omitted). But "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citations and internal quotation marks omitted).

Even if the plaintiff makes both showings necessary to overcome the defendant's assertion of qualified immunity, the defendant may still be entitled to summary judgment on the merits of the constitutional claim. In that situation, the court must then consider "the *true* factual landscape—as opposed to the factual landscape as plaintiff would have it," to determine "whether [the] defendant can carry the traditional summary judgment burden of establishing that there are no genuine issues of material fact for jury resolution and that defendant is entitled to judgment as a matter of law." *Thomson*, 584 F.3d at 1326 (Holmes, J., concurring) (emphasis in original).

### 2.    Analysis

Moman claims Mitchell and Tuell violated his rights, as guaranteed by the Fourth Amendment, to be free from an unreasonable search and seizure. Dkt. 1 at 11-13; *see* U.S. Const.

20

amend. IV.  "The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures.  A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property."  *Horton v. California*, 496 U.S. 128, 133 (1990).  Despite the importance of the rights protected by the Fourth Amendment, the "ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

As previously stated, Moman claims Mitchell and Tuell acted unreasonably by exceeding the scope of a lawful search warrant when they searched for burglary tools and investigated ownership of motorcycles on Moman's property and when they seized his motorcycle even though it was not one of the specific items listed in the warrant.  Dkt. No. 1 at 11-13.  For two reasons, the Court finds that Moman's version of the facts, to the extent those facts find support in the record, does not establish that Mitchell and Tuell violated his Fourth Amendment rights with respect to either the search or the seizure.

First, the portion of Moman's claim that challenges the reasonableness of the detectives' participation in the search rests on his assertion that Mitchell and Tuell joined the OGU officers in executing the warrant because they suspected that Moman was involved in the Westview burglary and intended to search for evidence to confirm their suspicions.  But regardless of whether Mitchell and Tuell suspected that they might find items related to the Westview burglary, that would not render the search unlawful.  The basis for this conclusion is aptly explained by the United States Court of Appeals for the Tenth Circuit's following discussion of *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), and *Horton v. California*, 496 U.S. 128 (1990):

> In [*Coolidge*], a plurality of the Supreme Court set forth the contours of the "plain view" exception to the Fourth Amendment's warrant requirement.  The plurality stated that an officer could seize an item for which he had no warrant when that item is found in plain view and (1) the officers are lawfully in a position to observe

the item; (2) the discovery of the item is inadvertent; and (3) it is immediately apparent to the searching officers that the item is evidence of a crime or contraband. *Coolidge*, 403 U.S. at 468-71, 91 S. Ct. 2022 (plurality opinion); *Horton v. California*, 496 U.S. 128, 142, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990) (Brennan, J., dissenting).   Especially relevant here is the second requirement set forth in *Coolidge*:  the inadvertence requirement. The *Coolidge* plurality made clear that the Fourth Amendment's warrant requirement dictates that police obtain a warrant for items that they know about and intend to seize:  "If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location and intend to seize it, then there is a violation of the express constitutional requirement of 'Warrants . . . particularly describing . . . [the] things to be seized.'"  *Coolidge*, 403 U.S. at 471, 91 S. Ct. 2022 (plurality opinion) (citing U.S. Const. amend. IV).

However, because the inadvertence requirement to the plain view exception was announced by only a plurality of the Court, there was some question as to whether the requirement was binding precedent. *See Texas v. Brown*, 460 U.S. 730, 737, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983) (plurality opinion) (stating that, even though the inadvertence requirement had generally been applied by lower courts, it "has never been expressly adopted by a majority of this Court" and that it was "not a binding precedent").    In 1990, a majority of the Court finally held that inadvertence "is not a necessary condition" of "legitimate 'plain-view' seizures." *Horton*, 496 U.S. at 130, 110 S. Ct. 2301.  The Court stated that "[t]he fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement." *Id.* at 138, 110 S. Ct. 2301.

*United States v. Le*, 173 F.3d 1258, 1267-68 (10th Cir. 1999).

Applying these principles here, the OGU officers had a lawful warrant authorizing a search of Moman's home, premises, and vehicles for firearms, ammunition, proof of ownership of the firearms, and proof of residency.  Blaylock therefore was lawfully in a position to see the burglary tools he found in Moman's living room.  And, under Moman's version of the facts—a version that posits without evidentiary support that Mitchell and Tuell joined the OGU officers' search because the detectives could not obtain their own search warrant—it would be reasonable to infer that Mitchell and Tuell shared information with Blaylock about the Westview burglary investigation

either before or during the execution of the OGU officers' search warrant.[21]   Thus, the incriminating nature of the burglary tools, particularly when found in close proximity to baggies containing large and small quantities of prescription medications, would have been immediately apparent to Blaylock.  In light of *Horton*, even if both detectives participated in the entire search, suspected that they might find evidence related to the Westview burglary, and intended to seize that evidence if found, the detectives' interest in those items which were not listed on the search warrant did not invalidate the lawful search or result in an illegal seizure.

Second, accepting as true Moman's allegations that both Mitchell and Tuell investigated the ownership of the motorcycles on his property and that both detectives played some role in the seizure of Moman's motorcycle, these actions did not exceed, much less grossly exceed, the scope of the lawful search warrant.  As previously noted, the warrant expressly permitted a search of the "house, building and premises, the curtilage thereof and the appurtenances thereunto, *and any vehicles directly on the property or in the street in front of or nearby or adjacent to [Moman's residence], provided that prior to searching said vehicle or vehicles, the vehicles can be specifically connected to [Moman]*, belonging for the described property, *and if found to seize the same and safely keep it*."  Dkt. No. 28-1 at 1 (emphasis added).  Mitchell and Tuell's alleged actions in investigating the ownership of, and in seizing, both motorcycles found on Moman's property were thus entirely consistent with the warrant.

---

[21]   As previously discussed, Moman belatedly attempted to provide evidentiary support for his allegation that Mitchell assisted with the OGU's search because Mitchell tried and failed to obtain a warrant to search Moman's home for the burglary tools.  Dkt. No. 31 at 1-2; *see supra* nn.1, 14. But even without Moman's purported evidence, the Court has inferred from the existing record, viewed in Moman's favor, that Mitchell and Blaylock discussed the burglary and the likelihood that certain burglary tools might be found in Moman's home.

### 3.      Conclusion

Moman's version of the facts does not show that Mitchell's and Tuell's alleged actions in assisting with the execution of the search warrant and in seizing items not listed in the warrant violated his Fourth Amendment rights.  As a result, the Court concludes that Mitchell and Tuell are entitled to qualified immunity as to the Fourth Amendment search-and-seizure claim.

## CONCLUSION

Based on the foregoing analysis, the Court concludes that Defendants are entitled to judgment as a matter of law (1) as to the Fourth Amendment excessive-force claim asserted against Barnhart, in his individual capacity, based on the defense that *Heck* bars that claim, (2) as to any official-capacity claims asserted against any defendant based on the defense that the factual allegations in the Complaint fail to state any plausible official-capacity claims, and (3) as to the Fourth Amendment search-and-seizure claim asserted against Mitchell and Tuell, in their individual capacities, based on the defense that both detectives have qualified immunity.  The Court therefore GRANTS the Motion.  Because the grant of summary judgment as to both individual-capacity Fourth Amendment claims—one on the basis of *Heck* and one on the basis of qualified immunity—and all official-capacity claims leaves Moman with no claims on which he can proceed, this is a final order terminating this civil rights action.

IT IS THEREFORE ORDERED that:

1. Moman's Letter [Dkt. No. 31] is construed, in part, as a motion requesting leave to file an out-of-time response and is DENIED.

2. Defendants' Motion for Summary Judgment and Brief in Support [Dkt. No. 28] is GRANTED.

3. This is a final order terminating this action.

4. A separate judgment shall be entered in this matter.

DATED this 25th day of August 2022.

_____
JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE